## EVIDENCE



FILED

AUG 23 2017

EDWARD A. TAKARA, CLERK
UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT of LOUISIANA

**Case:**

**Name:** Double Eagle Energy Services, LLC

**Number:** 17-80717          **Adv. #**

**Hearing Date:** 8-23-17

**Type of Hearing:**

   Mtn for Interim and Final Orders (Doc #37)

**Exhibits:**

   Db. 1 - Receivables Purchase Agreement
   Db. 2 - First Amendment to Receivables Purchase Agreement
                                    (Drell)



FILED

AUG 2 3 2017

EDWARD A. TAKARA, CLERK
UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA

# RECEIVABLES PURCHASE AGREEMENT



EXHIBIT
17-80717
Db. 1

THIS RECEIVABLES PURCHASE AGREEMENT (the "Agreement") is made as of the 11th day of August, 2017, by and between **DOUBLE EAGLE ENERGY SERVICES, L.L.C.** (Louisiana Organizational Number:       )49K) ("Seller") and **GULF COAST BANK & TRUST COMPANY** ("Purchaser").

1. **Definitions**. The following terms used herein shall have the following meaning. All capitalized terms not herein defined shall have the meaning set forth in the Uniform Commercial Code:

"**Accounts**" - any accounts, contract rights, chattel paper (electronic or written), notes, general intangibles, and payment intangibles,, and all documents, contracts, invoices and instruments evidencing or constituting the same and all security instruments and security agreements relating thereto, which are created, generated, acquired or otherwise owned by the Seller, and all cash and non-cash proceeds thereof, including any merchandise returned or rejected by, or repossessed from, Account Debtors.

"**Account Debtor**" - the obligor on an Account.

"**Accounts Transmittal**" - a form supplied (Schedule B) by Purchaser from time to time wherein Seller lists such of its Accounts as it requests that Purchaser purchase under the terms of this Agreement.

"**Accrual Termination Date**" - the date that is three (3) Business Days following the date on which Purchaser has collected, in cash, from the Account Debtor, or been paid by the Seller (by Reserve Account adjustment, Seller reimbursement or otherwise) an amount equal to the Purchaser Investment.

"**Bankruptcy Proceedings**" - the bankruptcy proceedings of Seller in the matter captioned In Re Double Eagle Energy Services, LLC, Case No. 17-80717, United States Bankruptcy Court for the Western District of Louisiana (Alexandria Division), and any consolidations and refilings thereof.

"**Business Day**"- any day that Purchaser is open for business at its offices in New Orleans, Louisiana.

"**Collateral**" - all now owned and hereafter acquired (i) accounts, chattel paper, other Accounts, instruments (including promissory notes), investment property, documents, and general intangibles; including without limitation all reserve accounts, residual payments, credits and reserves, and letter-of credit rights, (ii) all deposit accounts; and (iii) all proceeds from any of the foregoing.

"**Eligible Account**" - an Account which is acceptable for purchase as determined by Purchaser in the exercise of its sole credit or business judgment.

"**Events of Default**" - See Section 12.1.

"**Face Amount**" - the amount shown as due on an Account.

"**Fixed Discount**" - (a) one and one quarter of one percent (1.25%) of the Face Amount of each Purchased Account, and (b) six hundred and twenty five thousandths of one percent (0.625%) of the Face Amount of each Purchased Account for every fifteen (15) day period (or portion thereof) after the Fixed Discount Date that any portion of the Purchased Account remains unpaid.

"**Fixed Discount Date**" – thirty (30) days from the creation date of a Purchased Account.

"**Ineligibility Event**" – with respect to any Purchased Account, the occurrence of any of the following: (i) the payment of such Purchased Account has been disputed by the Account Debtor obligated thereon (with Purchaser being under no obligation to determine the bona fides of such dispute); (ii) a breach by Seller of any of its warranties under Section 11 hereunder; or (iii) the failure of Purchaser to receive from the Account Debtor obligated thereon payment in cash equal or greater than the Purchaser Investment on or before the Late Payment Date.

"**Initial Payment**" – for each Purchased Account, the Net Face Amount less the Reserve Amount relating to that Purchased Account.

"**Initial Payment Date**" – with respect to any Purchased Account, the date on which the Initial Payment for such Account is paid.

"**Late Charge**" – two percent (2.00%) per month.

"**Late Payment Date**" - the date which is ninety (90) days from the date on which a Purchased Account was created.

"**Lockbox Address**" – the following address:     P.O. Box 731152
                                                  Dallas, TX 75373-1152

"**Maximum Amount**" - $100,000.00, less any amounts owing under Related Party Documents.

"**Misdirected Payment Fee**" - fifteen percent (15%) of the amount of any payment on account of a Purchased Account which has been received by Seller and not delivered in kind to Purchaser on the next banking day following the date of receipt by Seller.

"**Missing Notation Fee**" – fifteen percent (15%) of the Face Amount.

"**Net Face Amount**" - the Face Amount of a Purchased Account, less all credits, discounts, and allowances to which the Account Debtor is entitled.

"**Notation**" - "This account has been assigned and is payable directly to Gulf Coast Bank & Trust Company, located at 200 St. Charles Ave., New Orleans, LA 70130. All payments should be made to Gulf Coast Bank & Trust Company at the following address: **P.O. Box 731152, Dallas, TX 75373-1152**", or such other notation as may be required by Purchaser.

"**Obligations**" - all present and future obligations owing by Seller and/or any Related Party to Purchaser whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or unliquidated, secured or unsecured, original or renewed or extended, whether arising before, during or after the commencement of any bankruptcy case in which Seller and/or Related Party is a Debtor, including but not limited to any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations; and all principal, interest, fees, charges, expenses, attorneys' fees and accountants' fees chargeable to Seller and/or Related Party or incurred by Purchaser in connection with this Agreement and/or the transaction(s) related thereto.

"**Prime Rate**" means the rate of interest published by the Wall Street Journal on such date

Receivables Purchase Agreement          -2-

(or the immediately preceding Business Day, if such date is not a Business Day) as the "prime" rate of interest (currently 4.25%). In the event such rate is not published or available, Purchaser may select a substitute interest rate index of comparable nature, as determined by Purchaser in its sole reasonable discretion. The Prime Rate will be adjusted during the term of this Agreement on a daily basis.

**"Purchase Price"** - the Face Amount less, without duplication, discounts, returns, credits or allowances of any nature at any time issued, owing, granted or outstanding.

**"Purchased Accounts"** - Accounts purchased hereunder which have not been Repurchased.

**"Purchaser Investment"** - with respect to a Purchased Account, the sum of (i) the Initial Payment, plus (ii) all Fixed Discounts, Variable Discounts, fees and charges owed by Seller to Purchaser relating to the Purchased Account.

**"Related Party"** – not applicable

**"Related Party Documents"** – means the Receivable Purchase Agreement between Related Party and Purchaser together with all amendments thereto and all documents executed in connection therewith, as well as all other documents executed in connection with any Obligations of Related Party to Purchaser.

**"Repurchased"** - an Account has been repurchased when Seller has paid to Purchaser the then unpaid Face Amount, together with all other amounts, including Fixed Discounts and Variable Discounts, due with respect to such Account, upon demand by Purchaser under the terms hereof.

**"Required Reserve Amount"** - the Reserve Percentage multiplied by the unpaid balance of Purchased Accounts.

**"Reserve Account"** - a bookkeeping account on the books of the Purchaser representing an unpaid portion of the Purchase Price, maintained by Purchaser to ensure Seller's performance with the provisions hereof.

**"Reserve Amount"** -means the Net Face Amount of any Purchased Account, times the Reserve Percentage for such Purchased Account.

**"Reserve Percentage"** – twenty percent (20.00%).

**"Reserve Shortfall"** - the amount by which the Reserve Account is less than the Required Reserve Amount.

**"Seller's Account"** - any demand deposit account maintained by Seller.

2. **Sale; Purchase Price; Billing; Reserve**

    2.1    <u>Assignment and Sale</u>.

        2.1.1    Seller shall offer to sell its Accounts to Purchaser as absolute owner, **with full recourse**, such Accounts to be listed from time to time on an Accounts Transmittal.

        2.1.2    Each Accounts Transmittal shall be accompanied by such documentation

Receivables Purchase Agreement       **-3-**

supporting and evidencing the Account as Purchaser shall from time to time request.

2.1.3 Purchaser may purchase from Seller such Accounts as Purchaser determines to be Eligible Accounts in its sole discretion, so long as the unpaid balance of the Purchased Accounts does not exceed, before and after such purchase, the Maximum Amount.

2.1.4 The sale of each Purchased Account shall be deemed perfected and absolute upon the payment by Purchaser of the Initial Payment therefore. GCBC's books and records shall be conclusive evidence of such payment, absent manifest error.

2.1.5 The following shall apply in all cases in which the goods sold or services provided giving rise to a Purchase Account are provided by a third party (herein, a "Subcontractor"). In addition to Purchaser's set off and other rights hereunder, including its right to apply payments to the Reserve Account under Section 2.3, Purchaser shall have the right to apply the proceeds of any purchase of Purchased Accounts to the payment of amounts that may be due to one or more Subcontractors in connection with the Purchased Account, or in connection with any one or more Account subject to the security interests granted hereunder. This right shall exist, whether or not the Subcontractor has lien rights or claims against the account debtor or any bonding company in connection with such goods or services, and whether or not the account debtor would hold set off or application rights with respect to the Purchased Account or Account if the Subcontractor is not paid by Seller.

2.2 Subject to the terms and conditions of this Agreement, Purchaser is authorized to purchase Accounts upon telephonic, facsimile or other instructions received from anyone purporting to be an officer, employee or representative of Seller.

2.3 Reserve Account.

2.3.1 Purchaser may apply a portion of any Purchase Price to the Reserve Account in the amount of the Reserve Shortfall.

2.3.2 Seller shall pay to Purchaser on demand the amount of any Reserve Shortfall.

2.3.3 Purchaser shall pay to Seller upon Seller's request, any amount by which collected funds in the Reserve Account are greater than the Required Reserve Amount. Purchaser shall be entitled to withhold payment to the Seller of funds in excess of the Required Reserve Amount if an Event of Default exists or if Purchaser, in its sole and absolute discretion, believes that such balance should be held in the Reserve Account to provide adequate available balances for existing or potential charges against the Reserve Account to satisfy the Obligations of the Company.

2.3.4 Purchaser may charge the Reserve Account with respect to any Obligation, including any amounts due from Seller to Purchaser hereunder, in Purchaser's sole discretion and without prior notice to Seller.

2.3.5 Upon termination of this Agreement Purchaser may retain the Reserve Account (i) for ninety (90) days thereafter to be applied to payment of any Obligations that were unknown to Purchaser at the time of termination, and (ii) on a continuing basis thereafter until such time as Seller has executed and delivered to Purchaser a Release Agreement in the form of Schedule A hereto.

3. **Fees.** Seller shall pay to Purchaser:

Receivables Purchase Agreement          -4-

3.1    <u>Fixed Discount</u>. Seller shall pay to Purchaser a Fixed Discount, which shall accrue on each Purchased Account beginning on the Initial Payment Date up to and including the date that is three (3) business days following the date on which Purchaser has collected, in cash, from the Account Debtor, or been paid by the Seller (by Reserve Account adjustment, Seller reimbursement or otherwise) an amount equal to the Purchase Price (the final accrual date for a Purchased Account, the "Accrual Termination Date"). In the event that the Prime Rate changes during the term of this Agreement, Purchaser shall, for each change in the Prime Rate, have the right to without notice modify the Fixed Discount proportionally to the change in the Prime Rate.

3.2    <u>Variable Discount</u>. N/A

3.3    <u>Misdirected Payment Fee</u>. Any Misdirected Payment Fee immediately upon its accrual.

3.4    <u>Late Charge</u>. The Late Charge, payable on demand, or if no demand is made, on the first Business Day of each month, on:

    3.4.1    all past due amounts due from Seller to Purchaser hereunder; and

    3.4.2    the amount of any Reserve Shortfall.

3.5    <u>Missing Notation Fee</u>. The Missing Notation Fee on any invoice that is sent by Seller to an Account Debtor which does not contain the Notation.

3.6    <u>Out-of-pocket Expenses</u>. The out-of-pocket expenses directly incurred by Purchaser in the administration of this Agreement. In addition, Seller agrees to reimburse Purchaser for any fees relating to wires, overnight delivery, merchant card fees or any other standard charges.

**4. Repurchase Of Accounts**.

4.1 Purchaser may require that Seller repurchase, by payment of the unpaid Face Amount thereof together with any unpaid fees, Fixed Discounts or Variable Discounts relating to the Purchased Account on demand, or, at Purchaser's option, by Purchaser's charge to the Reserve Account, an of the following Purchased Accounts:

    4.1.1    any Purchased Account, the payment of which has been disputed by the Account Debtor obligated thereon, Purchaser being under no obligation to determine the bona fides of such dispute;

    4.1.2    all Purchased Accounts upon the occurrence of an Event of Default, or upon the termination date of this Agreement;

    4.1.3    any Purchased Account which remains unpaid beyond the Late Payment Date;

    4.1.4    any Purchased Account owing from an Account Debtor which, in the Purchaser's reasonable credit judgment, has become insolvent; and

    4.1.5    any Purchased Account for which Seller has breached any representation or warranty under Section 11 hereunder.

4.2     Purchaser shall retain its security interest in any Purchased Account that has been repurchased by Seller.

4.3     Any repurchase of a Purchased Account under this Agreement shall be without recourse to Purchaser, and without any warranty or representation, express or implied, and Seller waives in connection with any retransfer any and all such warranties, including any warranties of presentment, transfer or otherwise, any warranty concerning the solvency of any Account Debtor under a Purchased Account, the existence of any right or the absence of any defenses to payment, under the Uniform Commercial Code, the Louisiana Civil Code, or otherwise.

## 5.  Security Interest.

5.1     As collateral securing the Obligations, Seller grants to Purchaser a continuing first priority security interest in and to the Collateral.

5.2     Notwithstanding the creation of the above security interest, the relationship of the parties shall be that of Purchaser and Seller of accounts and obligor and obligee, and not that of lender and borrower.

## 6.  Bankruptcy Court Approval.  This Receivables Purchase Agreement is entered into following a motion and order in Seller's Bankruptcy Proceedings approving the execution and performance by the Seller, and approval by the court is a condition precedent to the effectiveness of this Agreement.

## 7.  Authorization to Purchaser.

7.1     Seller hereby irrevocably authorizes Purchaser and any designee of Purchaser, at Seller's sole expense, to exercise at any times in Purchaser's or such designee's discretion all or any of the following powers until all of the Obligations have been paid in full: (a) receive, take, endorse, assign, deliver, accept and deposit, in the name of Purchaser or Seller, any and all cash, checks, commercial paper, drafts, remittances and other instruments and documents relating to the Collateral or the proceeds thereof, (b) take or bring, in the name of Purchaser or Seller, all steps, actions, suits or proceedings deemed by Purchaser necessary or desirable to effect collection of or other realization upon the accounts and other Collateral, (c) after an Event of Default, change the address for delivery of mail to Seller and to receive and open mail addressed to Seller, (d) after an Event of Default, extend the time of payment of, compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all accounts or other Collateral which includes a monetary obligation and discharge or release any Account Debtor or other obligor, without affecting any of the Obligations, and (e) pay any sums necessary to discharge any lien or encumbrance which is senior to Purchaser's security interest in the Collateral, which sums shall be included as Obligations hereunder, and in connection with which sums the Late Charge shall accrue and be due and payable.

## 8.  Covenants By Seller.

8.1  After written notice by Purchaser to Seller, and automatically, without notice, after an Event of Default, Seller shall not, without the prior written consent of Purchaser in each instance, (a) grant any extension of time for payment of any of the accounts or any other Collateral which includes a monetary obligation, (b) compromise or settle any of the accounts or any such other Collateral for less than the full amount thereof, (c) release in whole or in part any Account Debtor or other person liable for the payment of any of the accounts or any such other Collateral, or (d) grant any credits, discounts, allowances, deductions, return authorizations or the like with respect to any of the accounts or any such other Collateral.

Receivables Purchase Agreement          -6-

8.2    Before sending any invoice evidencing an Account to the Account Debtor, Seller shall mark same with the Notation, or such other notation as Purchaser shall have advised Seller in writing.

8.3    Seller shall pay when due all payroll and other taxes, and shall provide proof thereof to Purchaser in such form as Purchaser shall reasonably require. This shall include an IRS form 8821 authorizing Gulf Coast Bank & Trust Company or its designees to obtain information directly from the IRS about Seller and the status of its taxes owed.

8.4    Seller shall not, without the prior written consent of Purchaser suffer to exist any lien (including any encumbrance or security interest) of any kind upon any of its assets, whether now owned or hereafter acquired, other than in favor of Purchaser.

8.5    Notwithstanding that Seller has agreed to pay the Misdirected Payment Fee pursuant to Section 3.3 hereof, Seller shall deliver in kind to Purchaser on the next banking day following the date of receipt by Seller of the amount of any payment on account of a Purchased Account.

8.6    The invoices related to all of the Accounts (whether or not Purchased Accounts) shall set forth the Lockbox Address as its sole address for payment. Seller shall establish a lock box (the "Lock Box") with Purchaser under Purchaser's exclusive control using the Lockbox Address and shall request in writing or otherwise take reasonable steps to ensure that all payments be sent directly to such Lock Box. Seller agrees that it will deposit or cause to be deposited promptly, and in any event no later than the first Business Day after the date of receipt thereof, all cash, checks, drafts or other similar items of payment relating to or constituting payments made in respect of any and all Collateral (whether or not otherwise delivered to a Lock Box) into the Lock Box, or in the case ACH wire transfers that it may receive, to immediately transfer such funds by wire transfer to a controlled account designated by Purchaser. With respect to collections on Accounts that are not Purchased Accounts (including Repurchased Accounts) and for which no amounts are owing to Purchaser, Purchaser is irrevocably authorized and empowered to apply any and all proceeds of collection of such Account received by Purchaser (at Purchaser's option, without obligation to do so) to the outstanding principal amount of, interest on, and other amounts owing in connection with the Obligations (in any order selected by Purchaser). Seller acknowledges and agrees (a) that all proceeds of collection of such Account by Purchaser will not be segregated by Purchaser and may be commingled with Purchaser's other funds, and (b) that Purchaser shall have no duty (fiduciary or otherwise) with respect to the proceeds of collection of such Accounts except as specifically provided for in this Agreement. If Purchaser either elects not to apply the proceeds of such collections to the Seller's Obligations, Purchaser may retain possession of such collections as additional Collateral; provided, however, that if no Event of Default has occurred, Purchaser shall release such collections to Seller at the written request of Seller within three (3) Business Days following the clearance of such payment item and its receipt of Seller's request.

8.7    Seller acknowledges that payments with respect to Accounts may be delivered to the Lockbox Address following the termination of this Agreement and the full satisfaction of the Obligations (such payments, the "Post-Termination Payments"). Seller further acknowledges that Purchaser shall have no liability whatsoever to Seller in connection with such Post-Termination Payments, and that Purchaser shall be entitled, following clearance of such payment item, to return any Post-Termination Payment directly to the maker of such Post-Termination Payment. The provisions of this Section 8.7 shall survive the expiration or earlier termination of this Agreement.

9. **Account Disputes.** Seller shall notify Purchaser promptly of and, if requested by Purchaser, will settle all disputes concerning any Purchased Account, at Seller's sole cost and expense. However, Seller shall not, without Purchaser's prior written consent, compromise or adjust any Purchased Account or

grant any additional discounts, allowances or credits thereon. Purchaser may, but is not required to, attempt to settle, compromise, or litigate (collectively, "Resolve") the dispute upon such terms as Purchaser in its sole discretion deem advisable, for Seller's account and risk and at Seller's sole expense. Upon the occurrence of an Event of Default, Purchaser may resolve such issues with respect to any Account of Seller.

      10.    **Perfection of Security Interest.** Seller shall execute and deliver to Purchaser such documents and instruments, including, without limitation, Uniform Commercial Code financing statements, as Purchaser may request from time to time in order to evidence and perfect its security interest in any collateral securing the Obligations.

      11.  **Representations and Warranties.**

      11.1    Seller represents and warrants that:

      11.1.1    Seller shall immediately notify Purchaser in writing (i) upon it acquiring knowledge of the occurrence of an Ineligibility Event, (ii) of any material adverse change in Seller's financial condition or its businesses, and (iii) of any litigation or claims against Seller which could materially affect the Seller or its business operations, financial condition or prospects;

      11.1.2    the Seller has good and indefeasible clear title to the Collateral, will convey clear title to all Purchased Accounts to Purchaser, and has the right, power and authority, subject to all applicable governmental regulations, to sell Purchased Accounts hereunder, and to grant a security interest in the Collateral to Purchaser;

      11.1.3    all Purchased Accounts are and will remain: (i) bona fide existing obligations created by the sale and delivery of goods or the rendition of services in the ordinary course of Seller's business; and (ii) unconditionally owed and will be paid to Purchaser without defenses, disputes, offsets, counterclaims, or rights of return or cancellation;

      11.1.4    the Collateral is not subject to, and is free and clear of, any lien, claim, pledge, security interest or encumbrance of any kind, other than those granted to Purchaser hereunder;

      11.1.5    the Seller is properly licensed and authorized to operate its business under all applicable state and federal laws in the name designated for Seller on the signature page of this Agreement;

      11.1.6    the Seller will not assign, pledge, subordinate, give a security interest in or otherwise transfer any Collateral to any entity other than Purchaser or its assigns;

      11.1.7    this Agreement is binding upon Seller as well as upon Seller's successors, representatives and assigns, and is legally enforceable in accordance with its terms;

      11.1.8    The Seller has conducted business under no name other than its name indicated herein, and uses no trade name or assumed name, excepts as follows: none;

      11.1.9    Seller has not filed any petition under the Bankruptcy Code of the United States nor has any petition in bankruptcy been filed against Seller; no application for appointment of a receiver or trustee for all or a substantial part of Seller's property is pending; and Seller has made no assignment for the benefit of creditors.

      11.2    The foregoing representations, covenants and warranties will run to the benefit of

Purchaser's successors and assigns and will be continuing in nature and will remain in full force and effect until all obligations and sums owing to Purchaser by Seller have been fully performed, paid and satisfied, whether or not this Agreement is canceled or terminated. Seller does hereby bind itself, its successors and assigns, to indemnify and hold Purchaser (and its successors and assigns) harmless from any and all cost incurred by Purchaser and its successors and assigns, including attorney's fees and court costs, for breach of any warranty expressed in this Section 11.

12. **Default.**

      12.1   <u>Events of Default</u>. The following events will constitute an Event of Default hereunder: (a) Seller defaults in the payment of any Obligations, (b) the conversion of the Bankruptcy Proceedings to a Chapter 7 proceeding, (c) any such guarantor fails to perform or observe any of such Guarantor's obligations to Purchaser or shall notify Purchaser of its intention to rescind, modify, terminate or revoke any guaranty of the Obligations, or any such guaranty shall cease to be in full force and effect for any reason whatever, (d) any Event of Default under and Related Party Documents, (e) Purchaser for any reason, in good faith, deems itself insecure with respect to the prospect of repayment or performance of the Obligations.

      12.2   <u>Effect of Default.</u>

      12.2.1  Upon the occurrence of any Event of Default, in addition to any rights Purchaser has under this Agreement or applicable law, Purchaser may immediately terminate this Agreement, at which time all Obligations shall become immediately become due and payable without notice.

      12.2.2  The Late Charge shall accrue and be payable on demand on any Obligation not paid when due.

      12.2.3  Purchaser may commence and effect collection of any and all Collateral by whatever means Purchaser deems reasonable and necessary, without recourse to judicial proceedings against Seller.

   ·13. **Termination; Effective Date.** This Agreement will be effective when accepted by Purchaser (the "Effective Date") and shall remain in full force for a period of twelve (12) months (the "Initial Term"). The Agreement shall be automatically extended and renewed for successive twelve (12) month periods following the Initial Term unless terminated by Purchaser or the Seller as hereinafter provided (each such twelve (12) month period, a "Renewal Term"). This Agreement may be terminated: (a) by the Seller at any time upon the giving of not less than ninety (90) days prior written notice of termination to Purchaser, or (b) by Purchaser at any time upon thirty (30) days prior written notice of termination to Seller, or, without notice by Purchaser to Seller if an Event of Default shall occur. Upon termination Seller shall pay the Obligations to Purchaser, and Purchaser shall not purchase any Accounts from Seller. Such termination shall not affect the rights of the parties in connection with any Accounts purchased prior to such termination. Notwithstanding anything to the contrary contained herein, the payment of a purchase price or any other advance by Purchaser to the Seller shall constitute Purchaser's affirmative consent and agreement to the terms and conditions set forth in this Agreement, without the requirement that Purchaser execute this Agreement.

14. **Indemnification and Release.**

      14.1   Seller shall indemnify, defend and hold Purchaser and its successors and assigns harmless from and against all loss, claims and damages arising from (i) any breach of any warranty or

representation hereunder; (ii) any action or inaction or liability of the Seller with respect to any Account, including any collection action, usury claim, violation of consumer credit, truth in lending, equal credit opportunity or unfair trade practice laws; or (iii) the manufacture, sale, possession or use of, or otherwise relating to, goods, or the performance of services, associated with or relating to any Account. Nothing herein shall constitute an assumption by Purchaser of any liability of the Seller under any Account, including any liability to deliver goods, render services, or to answer for any deficiencies with respect thereto, and Seller shall remain fully liable therefor.

14.2    Seller hereby releases and exculpates Purchaser, its officers, employees and designees, from any liability arising from any acts under this Agreement or in furtherance thereof whether of omission or commission, and whether based upon any error of judgment or mistake of law or fact, except for willful misconduct. In no event will Purchaser have any liability to Seller for lost profits or other special or consequential damages. Without limiting the generality of the foregoing, Seller releases Purchaser from any claims which Seller may now or hereafter have arising out of Purchaser's endorsement and deposit of checks issued by Seller's customers stating that they were in full payment of an account, but issued for less than the full amount which may have been owed on the account.

The provisions of this Section 14 shall survive the termination of this Agreement and the payment in full of the Obligations.

15.    **Reimbursement of Costs.**

15.1    Seller agrees to reimburse Purchaser on demand for the actual costs, including photocopying, travel, and attorneys' fees and expenses incurred in complying with any subpoena or other legal process attendant to any litigation in which Seller is a party;

15.2    Seller agrees to reimburse Purchaser on demand for the actual amount of all costs and expenses, including attorneys' fees, which Purchaser may incur in enforcing this Agreement and any documents prepared in connection herewith, or in connection with any federal or state insolvency proceeding commenced by or against Seller, including those (a) arising out the automatic stay, (b) seeking dismissal or conversion of the bankruptcy proceeding or (c) opposing confirmation of Seller's plan thereunder.

16.    **No Lien Termination Without Release.** In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by the Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any terminations or satisfactions of any of Purchaser's liens on the Collateral unless and until Seller has executed and delivered to Purchaser a Release Agreement in the form attached as Schedule A.

17.    **Entire Agreement.** This Agreement supersedes all prior or contemporaneous agreements and understandings between said parties, verbal or written, express or implied, relating to the subject matter hereof. No course of dealing, course of performance or trade usage, and no parol evidence of any nature, shall be used to supplement or modify any terms of this Agreement.

18.    **Choice of Law.** This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under, and enforced in accordance with the internal laws of the State of Louisiana.

19.    **Jury Trial Waiver.** IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING

HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

20. **Notice.**

20.1    All notices required to be given to any party other than Purchaser shall be deemed given upon the first to occur of:

20.1.1    deposit thereof in a receptacle under the control of the U.S. Postal Service;

20.1.2    transmittal by electronic means to a receiver under the control of such party; or

20.1.3    actual receipt by such party or an employee or agent of such party.

20.2    All notices required to be given to Purchaser hereunder shall be deemed given upon actual receipt by a responsible officer of Purchaser.

20.3    For the purposes hereof, notices hereunder shall be sent to the following addresses, or to such other addresses as each such party may in writing hereafter indicate:

| | | |
|---|---|---|
| (a) | If to Purchaser: | Gulf Coast Business Credit<br>1110 Highway 190, 2nd Floor<br>Covington, LA  70433<br>Phone No. 985-249-7200<br>Facsimile No. 985-898-3914 |
| (b) | If to Seller: | Double Eagle Energy Services, L.L.C.<br>10500 Hwy 80<br>Minden, LA 71055<br>Phone No. 318-377-0505<br>Facsimile No. 318-377-0504 |
| | With a copy to: | Gold Weems Bruser Sues & Rundell<br>Attn: Bradley L. Drell<br>2001 MacArthur Dr.<br>Alexandria, LA 71301<br>Phone No. 318-445-6471<br>Facsimile No. 318-445-6476 |

Receivables Purchase Agreement          -11-

21.    Determination of Initial Payment and Residual Payment. The parties acknowledge that the purchase of Purchased Accounts by Purchaser constitutes an outright conveyance and sale by Seller to Purchaser. Nothing herein, or any course of dealing in the future, with respect to any transactions consummated pursuant to this Agreement shall be construed to be anything other than an outright purchase and sale of the applicable Purchased Accounts. All right, title and interest of Seller in any Purchased Accounts will be conveyed to Purchaser immediately upon the payment of the Initial Payment therefor, and the payment of the Initial Payment therefor will constitute consideration for the sale of the applicable Purchase Account and under no circumstances shall such transaction be construed as a loan and no consideration herein set forth is for the use, forbearance or detention of money.

22.    Provision Regarding Usury. Nothing herein shall be construed as to require the payment of interest; however, should a court of competent jurisdiction rule that any consideration paid hereunder is in fact or in law to be treated as interest, in no event shall Seller be obligated to pay that interest at a rate in excess of the maximum amount permitted by law, and all agreements, conditions, or stipulations contained herein, if any, which may in any event or contingency whatsoever operate to bind, obligate, or compel Seller to pay a rate of interest exceeding the maximum rate of interest permitted by law shall be without binding force or effect at law or in equity to the extent only of the excess of interest over such maximum rate of interest permitted by law. Also in such event, Purchaser may "spread" all charges characterized as interest over the entire term of all transactions with Seller and will refund to Seller the excess of any payments made over the highest lawful rate. It is the intention of the parties hereto that in the construction and interpretation of this Agreement, the foregoing sentence shall be given precedence over any other agreement, condition, or stipulation herein contained which is in conflict with same.

23.    **USA Patriot Act Notification**. The following notification is provided to Seller pursuant to Section 326 of the USA Patriot Act of 2001, 31 U.S.C. Section 5318:

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product. This will affect the Seller in several ways. When Seller opens an account, if Seller is an individual, Purchaser will ask for Seller's name, taxpayer identification number, residential address, date of birth, and other information that will allow Purchaser to identify Seller, and, if Seller is not an individual, Purchaser will ask for Seller's name, taxpayer identification number, business address, and other information that will allow Purchaser to identify Seller. Purchaser may also ask, if Seller is an individual, to see Seller's driver's license or other identifying documents, and, if Seller is not an individual, to see Seller's legal organizational documents or other identifying documents.

**IN WITNESS WHEREOF,** Purchaser and Seller have executed this Agreement on the day and year first above written.

**PURCHASER:**
**GULF COAST BANK & TRUST COMPANY**

By: _____
Name:
Title:

**SELLER:**
**DOUBLE EAGLE ENERGY SERVICES, L.L.C.**

By: _Bobby Joe Ratcliff S.,_
Name: Bobby Joe Ratcliff Sr.
Title:   Manager


**ACKNOWLEDGMENT**
**UNITED STATES OF AMERICA**
**STATE OF** _Ouisdra_
**COUNTY/PARISH OF** _Bossler_

On this _11th_ day of August, 2017, before me, a Notary Public duly qualified in and for the county/parish and state aforesaid, personally appeared Bobby Joe Ratcliff Sr., to me known, who being by me duly sworn, deposes and says that he/she resides at _515 Pebble St. Haughton La, 71037_ , that he/she signed the foregoing document as the free act of deed of Double Eagle Energy Services, L.L.C. (the "Seller"), in his/her capacity as Manager of the Seller pursuant to the authorization of the members and managers, as the free act and deed of the Seller, intending to be bound thereby.


Receivables Purchase Agreement            -13-

**IN TESTIMONY WHEREOF,** I have hereunto set my hand in the State of _Louisiana_,
County of _Rapides_, on the 11th day of August, 2017.

_____
NOTARY PUBLIC
MY COMMISSION EXPIRES:

Bradley L. Drell
Attorney-Notary
State of Louisiana
LA Bar Roll Number 24387
Notary ID Number 56573
Commission is for life.

Receivables Purchase Agreement       -14-

## RELEASE AGREEMENT

Double Eagle Energy Services, L.L.C. (the "Seller") has requested Gulf Coast Bank & Trust Company ("Purchaser") to terminate the Factoring Agreement (together with any amendments thereto, the "Agreement") between Purchaser and the Seller and the UCC-1 Financing Statement by the Seller in favor of Purchaser (the "Financing Statement"). The Seller has been provided with a statement concerning the estimated Obligations owed by the Seller under the Agreement, through the date referenced therein (the "Statement"). The Seller has requested Purchaser to agree to terminate the Agreement and the Financing Statement, upon Purchaser's receipt of payment in the amount stipulated in the Statement. Purchaser agrees to do so, provided that (a) you and your guarantor(s) agree to indemnify Purchaser for any dishonored or returned items (whether in whole or in part) for which credit was given in calculating the amount set forth in the Statement, by paying to Purchaser the amount of the dishonored or returned payment item (or, in the cases of partial dishonor, the amount that was not honored), within one (1) business day of receipt of notice from Purchaser to the Seller of the dishonor or return, (b) the Seller and its guarantor(s) further agree that should Purchaser be obligated to return any payment item in connection with any bankruptcy or insolvency proceeding, where the balance of the payment item was forwarded or credited to the Seller, or excluded from the balance of the Seller's Obligations in Purchaser's calculation of the payment amount due from the Seller under the Statement, that the Seller and its guarantor(s) will reimburse Purchaser for the amount that it is required to deliver with respect to the payment item in such bankruptcy or insolvency proceeding; and (c) that the Seller acknowledge that to the best of its knowledge, that Purchaser has performed its obligations under the Agreement, and that the Seller releases Purchaser from and against any claim or liability in connection with any act or failure to act of Purchaser under the Agreement, to the extent known to the Seller on the date hereof.

In accordance with the foregoing, Seller and its guarantor(s) agree as follows:

(i)     Seller and its guarantor(s) agree to indemnify Purchaser for any dishonored or returned items (whether in whole or in part) for which credit was given in calculating the amount set forth in the Statement, by paying to Purchaser the amount of the dishonored or returned payment item (or, in the cases of partial dishonor, the amount that was not honored), within one (1) business day of receipt of notice from Purchaser to the Seller of the dishonor or return;

(ii)    Seller and its guarantor(s) further agree that should Purchaser be obligated to return any payment item in connection with any bankruptcy or insolvency proceeding, where the balance of the payment item was forwarded or credited to the Seller, or excluded from the balance of the Seller's Obligations in Purchaser's calculation of the payment amount due from the Seller under the Statement, that the Seller and its guarantor(s) will reimburse Purchaser for the amount that it is required to deliver with respect to the payment item in such bankruptcy or insolvency proceeding; and

(iii)   Seller acknowledges that to the best of its knowledge, that Purchaser has performed its obligations under the Agreement, and that the Seller releases Purchaser from and against any claim or liability in connection with any act or failure to act of Purchaser under the Agreement, to the extent known to the Seller on the date hereof.

Seller acknowledges that nothing herein shall be deemed to release the Seller or its guarantors from any Obligations that are not fully paid and performed, and that Seller (and its guarantors, to the extent provided in the applicable guaranty of the guarantors), shall remain fully liable for the full payment of all Obligations when due. Please indicate your consent to the foregoing by signing where indicated below.

Date: *8-11-2017*

SIGNATURES OF SELLER AND GUARANTORS

*Buddy Joe Ratliff Sr.*

Receivables Purchase Agreement          -15-

**SCHEDULE B**
Schedule of Accounts

| Receivables Assigned to Gulf Coast Bank & Trust Company | | | | |
|---|---|---|---|---|
| **Debtor Name** | **Date** | **Invoice Number** | **P.O. Number** | **Amount** |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | **TOTAL** | |

*Attach a copy of the original invoice along with proof of completion and/or delivery of order.*

For valuable consideration, receipt which is hereby acknowledged, the undersigned hereby sells, assigns, sets over and transfers to **GULF COAST BANK & TRUST COMPANY**, its successors or assigns all its right, title and interest in and to the accounts above named, including all monies due or to become due thereon, all in accordance with and pursuant to that certain Security Agreement now existing by and between the undersigned and **GULF COAST BANK & TRUST COMPANY** Further, that all materials have been delivered and all services performed as represented on the above listed invoices, and that there are no existing offsets.

**FOR OFFICE USE ONLY**

PREP BY: _____        SCHEDULE #: _____

RECEIVED: _____        SENT VIA: _____

Date: _____    Seller: _____    By: _____
                          Double Eagle Energy Services, L.L.C.    Authorized Signature

-16-

UNANIMOUS CONSENT RESOLUTION
OF THE MEMBERS AND MANAGERS OF
DOUBLE EAGLE ENERGY SERVICES, L.L.C.
ON THE _18th_ DAY OF AUGUST, 2017

I, Bobby Joe Ratcliff Sr., a member/manager of Double Eagle Energy Services, L.L.C., a Louisiana limited liability company (hereinafter referred to as the "Company") and a person authorized to provide certifications, do hereby certify that I am a keeper of the company records and minutes of the proceedings of the members and managers of said Company, and that on the above date, the said members and managers of the Company by unanimous written consent, all requirements of notice and meeting being waived, did duly and lawfully in accordance with applicable law and the Articles of Organization and Operating Agreement of the Company, adopt the following resolutions:

RESOLVED, notwithstanding any provision of the Company's operating agreement to the contrary, that any ONE (1) or more member or manager of the Company (each, an "authorized representative") is hereby authorized to do the following:

**Receivables Purchase Agreement.** To enter into a Receivables Purchase Agreement with Gulf Coast Bank and Trust Company, under which this Company will undertake from time to time to sell to Gulf Coast Bank and Trust Company accounts and other receivables, on a true sale basis, for such price, on such terms, and containing such indemnities, warranties, recourse liabilities, repurchase obligations, and remedies as said authorized representative may approve in their sole discretion. All indebtedness of the Company to Gulf Coast Bank and Trust Company under the Receivables Purchase Agreement approved by said representative, whether in connection with an extension of credit, repurchase liabilities, or otherwise, is fully authorized hereunder.

**Grant Security.** To mortgage, pledge, hypothecate, or otherwise encumber and deliver to Secured Party, as security for the payment of any loans so obtained, any promissory notes so executed, or any other or further indebtedness of the Company to Secured Party at any time owing, including under the Receivables Purchase Agreement, however the same may be evidenced, any property now or hereafter belonging to the Company or in which the Company now or hereafter may have an interest, including without limitation all real (immovable) property and all personal (movable) property and rights of the Company. Such property may be mortgaged, pledged, hypothecated, encumbered or otherwise secured at the time such loans are obtained or such indebtedness is incurred, or at any other time or times, and may be either in addition to or in lieu of any property theretofore mortgaged, pledged, hypothecated, encumbered or otherwise secured.

**Assignment of Receivables.** To execute schedules and confirmations of the assignment of the Company's receivables to Gulf Coast Bank and Trust Company pursuant to the Receivables Purchase Agreement, and to execute and deliver UCC-1 financing statements in connection therewith.

**Security Agreements.** To execute and deliver one or more mortgages, collateral mortgages, pledge agreements and other security agreements in favor of Secured Party to secure the prompt and punctual payment and satisfaction of the aforesaid indebtedness, under which said authorized representative may grant a continuing security interest in the property and/or the rights of the Company as more fully described therein, which mortgages, collateral mortgages, pledge agreements and other security agreements may

Consent

contain provisions for foreclosure under Louisiana executory process procedures, confessions of judgment, waivers of appraisal and other rights and notices, all of which remedies upon default are specifically consented to by this board.

**Negotiate Items.** To draw, endorse, and discount with Secured Party all drafts, trade acceptances, promissory notes, or other evidences of indebtedness payable to or belonging to the Company or in which the Company may have an interest, and either to receive cash for the same or to cause such proceeds to be credited to the account of the Company with Secured Party, or to cause such other disposition of the proceeds derived therefrom as they may deem advisable.

**Further Acts.** In the case of multiple advance loans or receivables purchase agreements, to designate additional or alternate individuals as being authorized to request advances and/or to sell receivables thereunder, and in all cases, to do and perform such other acts and things, to pay any and all fees and costs, and to execute and deliver such other documents and agreements, **including agreements waiving the right to a trial by jury** as they may in their discretion deem reasonably necessary or proper in order to carry into effect the provisions of these resolutions.

RESOLVED, that this resolution shall constitute an amendment to the Company's Operating Agreement, approved by unanimous member consent.

BE IT FURTHER RESOLVED, that the said authorized representative be and is hereby further authorized and empowered to execute for and on behalf of, and in the name of said Company, any and all other documents or instruments, in such form and containing such terms and conditions as said representative deems best, in the representative's sole discretion, in order to carry out the intents and purposes of the foregoing resolutions, and that all documents previously executed by said representative are hereby ratified, confirmed and acknowledged in all respects.

THE FOREGOING AUTHORITY includes the authority to execute any future amendments, refinancings and supplements to the foregoing documents, without the need for any further consent or approval by this board.

BE IT FURTHER RESOLVED, that the Company will notify Gulf Coast Bank and Trust Company in writing at its address provided in the documents (or such other address as it may provide from time to time) with prior notice before any (a) change in the name of the Company; (b) change in the authorized signers, (c) conversion of the Company to another type of entity; or (d) any revocation of any authority granted herein. No revocation of any authority granted herein, or termination of authority of any person as a result of the termination of their status as a member or manager, will be effect to rescind that authority with respect to Gulf Coast Bank and Trust Company, unless it is provided with prior written notice of such revocation or change in authority.

MEMBERS & MANAGERS OF COMPANY

Name: Bobby Joe Ratcliff Sr.

Name: Bobby J. Ratcliff Jr.

Consent

I further certify the above and foregoing to be a true and accurate copy of the resolutions adopted by the Company by unanimous written consent of its members and managers, and that said resolutions have not been rescinded, altered, modified, or changed and remain in full force and effect.

IN WITNESS WHEREOF, I have hereunto set my hand as manager/member of the Company on this 11th day of August, 2017.

By: *Bobby Joe Ratcliff Sr.*

Name: Bobby Joe Ratcliff Sr.

Title: Manager

Consent

## DOUBLE EAGLE ENERGY SERVICES, L.L.C.

### MANAGER'S CERTIFICATE

I, Bobby Joe Ratcliff Sr., a manager of Double Eagle Energy Services, L.L.C., a limited liability company duly organized and existing under the laws of the State of Louisiana (the "Company"), hereby certify that:

1.    Attached hereto as Exhibit "A" is a true, correct and complete copy of the Articles of Organization of the Company dated April 27, 2006 (the "Articles") which Articles have not been amended, annulled, rescinded or revoked and remain in full force and effect on the date hereof.

2.    Attached hereto as Exhibit "B" is a true, correct and complete copy of the Operating Agreement of the Company, and such Operating Agreement have not been amended, annulled, rescinded or revoked and remain in full force and effect on the date hereof.

3.    Attached hereto as Exhibit "C" is a true, correct and complete copy of the resolutions adopted by the unanimous written consent of the members and managers of the Company with respect to its transactions with Gulf Coast Bank and Trust Company, and such resolutions have not been amended, annulled, rescinded or revoked and remain in full force and effect on the date hereof.

4.    Set forth on Exhibit "D" attached hereto is a complete list of the members and managers of the Company as of the date hereof.

IN WITNESS WHEREOF, I have hereunto set my signature as manager of Double Eagle Energy Services, L.L.C., this the ⎸⎸ᵗʰ day of August, 2017.

Name:  Bobby Joe Ratcliff Sr.
Title:    Managing Member

EXHIBIT "D"

## Managers & Members

BOBBY JOE RATCLIFF SR.

BOBBY J. RATCLIFF JR.

# RPA GUARANTY

| | | | |
|---|---|---|---|
| **Obligor:** | Double Eagle Energy Services, L.L.C.<br>10500 Hwy 80<br>Minden, LA 71055 | **GCBC:** | Gulf Coast Bank and Trust Company<br>TIN: \<br>1110 Highway 190, 2nd Floor<br>Covington, LA 70433 |
| **Guarantor:** | Bobby Joe Ratcliff Sr.      Bobby J. Ratcliff Jr. | | |

**DEFINITIONS.** The following terms shall have the following meanings when used in this Agreement. The word "Agreement" means this RPA Guaranty as this RPA Guaranty may be amended or modified from time to time. The word "Guarantor" means individually, collectively and interchangeably Bobby Joe Ratcliff Sr., Bobby J. Ratcliff Jr. and all other persons guaranteeing payment and satisfaction of Obligor's RPA Obligations as hereinafter defined. The word "GCBC" means Gulf Coast Bank and Trust Company TIN: 72-1167423, its successors and assigns, and any subsequent holder or holders of Obligor's RPA Obligations. The word "Obligor" means Double Eagle Energy Services, L.L.C. .The words "RPA Obligations" means individually, collectively, interchangeably and without limitation (i) all amounts owing by Obligor under that certain Receivables Purchase Agreement of even date between Obligor and GCBC (the "RPA") including all repurchase obligations thereunder, (ii) all costs and expenses incurred by GCBC in connection with the collection of all or any part of the indebtedness and obligations owing by Obligor under the RPA, or the protection of, or realization upon, the collateral securing all or any part of such indebtedness and obligations, and (iii) all renewals, extensions, modifications and rearrangements of the indebtedness and obligations owing by Obligor under the RPA.

**GUARANTEE OF RPA OBLIGATIONS. Guarantor hereby absolutely and unconditionally agrees to, and by these presents does hereby, guarantee the prompt and punctual payment, performance and satisfaction of Obligor's present and future RPA Obligations in favor of GCBC, as outstanding from time to time.** Payments made on Obligor's RPA Obligations will not discharge or diminish the obligations and liability of Guarantor under this Agreement for any guaranteed RPA Obligations of Obligor in favor of GCBC. Guarantor's obligations and liability under this Agreement shall be on a "solidary" or "joint and several" basis along with Obligor to the same degree and extent as if Guarantor had been and/or will be a co-principal obligor and/or co-maker of Obligor's RPA Obligations. In the event that there is more than one Guarantor under this Agreement, or in the event that there are other guarantors, endorsers or sureties of all or any portion of Obligor's RPA Obligations, Guarantor's obligations and liability hereunder shall further be on a "solidary" or "joint and several" basis along with such other guarantors, endorsers and/or sureties.

**DURATION OF GUARANTY.** This Agreement and Guarantor's obligations and liability hereunder shall remain in full force and effect until such time as this Agreement may be canceled or otherwise terminated by GCBC under a written cancellation instrument in favor of Guarantor (subject to the automatic reinstatement provisions hereinbelow). Unless otherwise indicated under such a written cancellation instrument, GCBC's agreement to terminate or otherwise cancel this Agreement shall affect only, and shall be expressly limited to, Guarantor's continuing obligations and liability to guarantee Obligor's RPA Obligations incurred, originated and/or extended (without prior commitment) after the date of such a written cancellation instrument; with Guarantor remaining fully obligated and liable under this Agreement for any and all of Obligor's RPA Obligations incurred, originated, extended, or committed to prior to the date of such a written cancellation instrument. Without limiting the foregoing, following the expiration or termination of the RPA, and upon request of either GCBC or the Obligor, Guarantor shall execute a release agreement in the form attached to the RPA.

**DEFAULT.** Should any event of default occur or exist under any of Obligor's RPA Obligations in favor of GCBC, Guarantor unconditionally and absolutely agrees to pay GCBC the then unpaid amount of Obligor's RPA Obligations in principal, interest, costs, expenses, attorneys' fees and other fees and charges. Such payment or payments shall be made at GCBC's offices indicated above, immediately following demand by GCBC.

**GUARANTOR'S WAIVERS.** Guarantor hereby waives: (a) Notice of GCBC's acceptance of this Agreement; (b) presentment for payment of Obligor's RPA Obligations, notice of dishonor and of nonpayment, notice of intention to accelerate, notice of acceleration, protest and notice of protest, collection or institution of any suit or other action by GCBC in collection thereof, including any notice of default in payment thereof, or other notice to, or demand for payment thereof, on any party; (c) any right to require GCBC to notify Guarantor of any nonpayment relating to any collateral directly or indirectly securing Obligor's RPA Obligations, or notice of any action or inaction on the part of Obligor, GCBC, or any other guarantor, surety or endorser of Obligor's RPA Obligations, or notice of the creation of any new or additional RPA Obligations subject to this Agreement; (d) any rights to demand or require collateral security from the Obligor or any other person as provided under applicable law; (e) Any right to require GCBC to notify Guarantor of the terms, time and place of any public or private sale of any collateral directly or indirectly securing Obligor's RPA Obligations; (f) any "one action" or "anti-deficiency" law or any other law which may prevent GCBC from bringing any action, including a claim for deficiency, against Guarantor, before or after GCBC's commencement or completion of any foreclosure action, or any action in lieu of foreclosure; (g) any election of remedies by GCBC that may destroy or impair Guarantor's subrogation rights or Guarantor's right to proceed for reimbursement against Obligor or any other guarantor, surety or endorser of Obligor's RPA Obligations, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging Obligor's RPA Obligations; or (h) any disability or other defense of Obligor, or any other guarantor, surety or endorser, or any other person, or by reason of the cessation from any cause whatsoever, other than payment in full of Obligor's RPA Obligations.

**GUARANTOR'S SUBORDINATION OF RIGHTS.** In the event that Guarantor should for any reason (a) advance or lend monies to Obligor, whether or not such funds are used by Obligor to make payment(s) under Obligor's RPA Obligations, and/or (b) make any payment(s) to GCBC or others for and on behalf of Obligor under Obligor's RPA Obligations, and/or (c) make any payment to GCBC in total or partial satisfaction of Guarantor's obligations and liabilities under this Agreement, and/or (d) if any of Guarantor's property is used to pay or satisfy any of Obligor's RPA Obligations, Guarantor hereby agrees that any and all rights that Guarantor may have or acquire to collect from or to be reimbursed by Obligor (or from or by any other guarantor, endorser or surety of Obligor's RPA Obligations), whether Guarantor's rights of collection or reimbursement arise by way of subrogation to the rights of GCBC or otherwise, shall in all respects, whether or not Obligor is presently or

subsequently becomes insolvent, he subordinate, inferior and junior to the rights of GCBC to collect and enforce payment, performance and satisfaction of Obligor's then remaining RPA Obligations, until such time as Obligor's RPA Obligations are fully paid and satisfied. In the event of Obligor's insolvency or consequent liquidation of Obligor's assets, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Obligor applicable to the payment of claims of both GCBC and Guarantor shall be paid to GCBC and shall be first applied by GCBC to Obligor's then remaining RPA Obligations. Guarantor hereby assigns to GCBC all claims which it may have or acquire against Obligor or any assignee or trustee of Obligor in bankruptcy; provided that, such assignment shall be effective only for the purpose of assuring to GCBC full payment of Obligor's RPA Obligations guaranteed under this Agreement.

If now or hereafter (a) Obligor shall be or become insolvent, and (b) Obligor's RPA Obligations shall not at all times until paid be fully secured by collateral pledged by Obligor, Guarantor hereby forever waives and relinquishes in favor of GCBC and Obligor, and their respective successors, any claim or right to payment Guarantor may now have or hereafter have or acquire against Obligor, by subrogation or otherwise, so that at no time shall Guarantor be or become a "creditor" of Obligor within the meaning of 11 U.S.C. section 547(b), or any successor provision of the Federal bankruptcy laws.

**DEPOSIT ACCOUNTS.** As collateral security for repayment of Guarantor's obligations hereunder and under any additional guaranties previously granted or to be granted by Guarantor in the future, and additionally as collateral security for any present and future indebtedness of Guarantor in favor of GCBC (with the exception of any indebtedness under a consumer credit card account), Guarantor is granting GCBC a continuing security interest in any and all funds that Guarantor may now and in the future have on deposit with GCBC or in certificates of deposit or other deposit accounts as to which Guarantor is an account holder (with the exception of IRA, pension, and other tax-deferred deposits). Guarantor further agrees that GCBC may at any time apply any funds that Guarantor may have on deposit with GCBC or in certificates of deposit or other deposit accounts as to which Guarantor is an account holder against the unpaid balance of any and all other present and future obligations and indebtedness of Guarantor to GCBC, in principal, interest, fees, costs, expenses, and attorneys' fees.

**ADDITIONAL COVENANTS.** Guarantor agrees that GCBC may, at its sole option, at any time, and from time to time, without the consent of or notice to Guarantor, or any of them, or to any other party, and without incurring any responsibility to Guarantor or to any other party, and without impairing or releasing any of Guarantor's obligations or liabilities under this Agreement: (a) discharge, release or agree not to sue any party (including, but not limited to, Obligor or any other guarantor, surety, or endorser of Obligor's RPA Obligations), who is or may be liable to GCBC for any of Obligor's RPA Obligations; (b) Alter, renew, extend, accelerate, or otherwise change the manner, place, terms and/or times of payment or other terms of Obligor's RPA Obligations, or any part thereof, including any increase or decrease in the rate or rates of interest on any of Obligor's RPA Obligations; (c) settle or compromise any of Obligor's RPA Obligations; (d) subordinate and/or agree to subordinate the payment of all or any part of Obligor's RPA Obligations, or GCBC's security rights in any collateral directly or indirectly securing any such RPA Obligations, to the payment and/or security rights of any other present and/or future creditors of Obligor; (e) Apply any payments and/or proceeds to any of Obligor's RPA Obligations in such priority or with such preferences as GCBC may determine in its sole discretion, regardless of which of Obligor's RPA Obligations then remains unpaid; and (f) Enter into, deliver, modify, amend, or waive compliance with, any instrument or arrangement evidencing, securing or otherwise affecting, all or any part of Obligor's RPA Obligations. No course of dealing between GCBC and Obligor (or any other guarantor, surety or endorser of Obligor's RPA Obligations), nor any failure or delay on the part of GCBC to exercise any of GCBC's rights and remedies under this Agreement or any other agreement or agreements by and between GCBC and Obligor (or any other guarantor, surety or endorser), shall have the effect of impairing or releasing Guarantor's obligations and liabilities to GCBC, or of waiving any of GCBC's rights and remedies under this Agreement or otherwise. Any partial exercise of any rights and remedies granted to GCBC shall furthermore not constitute a waiver of any of GCBC's other rights and remedies; it being Guarantor's intent and agreement that GCBC's rights and remedies shall be cumulative in nature. Guarantor further agrees that, should Obligor default under any of its RPA Obligations, any waiver or forbearance on the part of GCBC to pursue GCBC's available rights and remedies shall be binding upon GCBC only to the extent that GCBC specifically agrees to such waiver or forbearance in writing. A waiver or forbearance on the part of GCBC as to one event of default shall not constitute a waiver or forbearance as to any other default.

**NO RELEASE OF GUARANTOR.** Guarantor's obligations and liabilities under this Agreement shall not be released, impaired, reduced, or otherwise affected by, and shall continue in full force and effect notwithstanding the occurrence of any event, including without limitation any one or more of the following events: (a) The death, insolvency, bankruptcy, arrangement, adjustment, composition, liquidation, disability, dissolution, or lack of authority (whether corporate, partnership or trust) of Obligor (or any person acting on Obligor's behalf), or of any other guarantor, surety or endorser of Obligor's RPA Obligations. (b) Any payment by Obligor, or any other party, to GCBC that is held to constitute a preferential transfer or a fraudulent conveyance under any applicable law, or any such amounts or payment which, for any reason, GCBC is required to refund or repay to Obligor or to any other person.
(c) Any dissolution of Obligor, or any sale, lease or transfer of all or any part of Obligor's assets. (d) Any failure of GCBC to notify Guarantor of the making of additional loans or other extensions of credit in reliance on this Agreement.

**AUTOMATIC REINSTATEMENT.** This Agreement and Guarantor's obligations and liabilities hereunder shall continue to be effective, and/or shall automatically and retroactively be reinstated, if a release or discharge has occurred, or if at any time, any payment or part thereof to GCBC with respect to any of Obligor's RPA Obligations, is rescinded or must otherwise be restored by GCBC pursuant to any insolvency, bankruptcy, reorganization, receivership, or any other debt relief granted to Obligor or to any other party to Obligor's RPA Obligations or any such security therefor. In the event that GCBC must rescind or restore any payment received in total or partial satisfaction of Obligor's RPA Obligations, any prior release or discharge from the terms of this Agreement given to Guarantor shall be without effect, and this Agreement and Guarantor's obligations and liabilities hereunder shall automatically and retroactively be renewed and/or reinstated and shall remain in full force and effect to the same degree and extent as if such a release or discharge had never been granted. It is the intention of GCBC and Guarantor that Guarantor's obligations and liabilities hereunder shall not be discharged except by Guarantor's full and complete performance and satisfaction of such obligations and liabilities; and then only to the extent of such performance.

**REPRESENTATIONS AND WARRANTIES BY GUARANTOR.** Guarantor represents and warrants that: (a) Guarantor has the lawful power to own its properties and to engage in its business as presently conducted. (b) Guarantor's guaranty of Obligor's RPA Obligations and Guarantor's execution, delivery and performance of this Agreement are not in violation of any laws and will not result in a default under any contract, agreement, or instrument to which Guarantor is a party, or by which Guarantor or its property may be bound. (c) Guarantor has agreed

and consented to execute this Agreement and to guarantee Obligor's RPA Obligations in favor of GCBC, at Obligor's request and not at the request of GCBC. (d) Guarantor will receive and/or has received a direct or indirect material benefit from the transactions contemplated herein and/or arising out of Obligor's RPA Obligations. (e) Guarantor has established adequate means of obtaining information from Obligor on a continuing basis regarding Obligor's financial condition. (f) GCBC has made no representations to Guarantor as to the creditworthiness of Obligor.

**ADDITIONAL DOCUMENTS; FINANCIAL STATEMENTS.** Upon the reasonable request of GCBC, Guarantor will, at any time, and from time to time, execute and deliver to GCBC any and all such financial instruments and documents, and supply such additional information, as may be necessary or advisable in the opinion of GCBC to obtain the full benefits of this Agreement. Guarantor further agrees to provide GCBC with such financial statements and other related information at such frequencies and in such detail as GCBC may reasonably request.

**CONSENT TO PARTICIPATION.** Guarantor recognizes and agrees that GCBC may, from time to time, one or more times, transfer all or any part of Obligor's RPA Obligations through sales of participation interests in such RPA Obligations to one or more third party purchasers. Guarantor specifically agrees and consents to all such transfers and assignments, and Guarantor further waives any subsequent notice of such transfers and assignments as may be provided under Louisiana law. Guarantor additionally agrees that the purchaser of a participation interest in Obligor's RPA Obligations will be considered as the absolute owner of a percentage interest of such RPA Obligations and that such a purchaser will have all of the rights granted under any participation agreement governing the sale of such a participation interest. Guarantor waives any rights of offset that Guarantor may have against GCBC and/or any purchaser of such a participation interest, and Guarantor unconditionally agrees that either GCBC or such a purchaser may enforce Guarantor's obligations and liabilities under this Agreement, irrespective of the failure or insolvency of GCBC or any such purchaser.

**CANCELLATION OF AGREEMENT; EFFECT.** Guarantor hereby waives any right it may have to terminate or otherwise cancel this Agreement without the express written consent of GCBC, it being the intent of Guarantor and GCBC that this Agreement may only be terminated or cancelled pursuant to a written cancellation instrument executed by GCBC and Guarantor Unless otherwise indicated under such a written cancellation instrument, GCBC's agreement to terminate or otherwise cancel this Agreement shall affect only, and shall be expressly limited to, Guarantor's continuing obligations and liability to guarantee the RPA Obligations incurred, originated and/or extended (without prior commitment) after the date of such a written cancellation instrument; with Guarantor remaining fully obligated and liable under this Agreement for any and all of the RPA Obligations incurred, originated, extended, or committed to prior to the date of such a written cancellation instrument. Nothing under this Agreement or under any other agreement or understanding by and between Guarantor and GCBC, shall in any way obligate, or be construed to obligate, GCBC to agree to the subsequent termination or cancellation of Guarantor's obligations and liability hereunder; it being fully understood and agreed to by Guarantor that GCBC has and intends to continue to rely on Guarantor's assets, income and financial resources in extending credit and other RPA Obligations to and in favor of Obligor, and that to release Guarantor from Guarantor's continuing obligations and liabilities under this Agreement would so prejudice GCBC that GCBC may, within its sole and uncontrolled discretion and judgment, refuse to release Guarantor from any of its continuing obligations and liability under this Agreement for any reason whatsoever as long as any of the RPA Obligations remains unpaid and outstanding, or otherwise.

**NOTICES.** Any notice provided in this Agreement must be in writing and will be considered as given on the day it is delivered by hand or deposited in the U.S. mail, postage prepaid, addressed to the person to whom the notice is to be given at the address shown above or at such other addresses as any party may designate to the other in writing. If there is more than one Guarantor under this Agreement, notice to any Guarantor shall constitute notice to all Guarantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendment.** No amendment, modification, consent or waiver of any provision of this Agreement, and no consent to any departure by Guarantor therefrom, shall be effective unless the same shall be in writing signed by a duly authorized officer of GCBC, and then shall be effective only as to the specific instance and for the specific purpose for which given.

**Governing Law.** This Agreement shall be governed and construed in accordance with the substantive laws of the State of Louisiana.

**Severability.** If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable. This Agreement shall be construed and enforceable as if the illegal, invalid or unenforceable provision had never comprised a part of it, and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement, a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and legal, valid and enforceable.

**Successors and Assigns Bound.** Guarantor's obligations and liabilities under this Agreement shall be binding upon Guarantor's successors, heirs, legatees, devisees, administrators, executors and assigns.

**THE UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, THE GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO GCBC AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED. NO FORMAL ACCEPTANCE BY GCBC IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED AUGUST ___, 2017.**

GUARANTOR:

x _____
BOBBY JOE RATCLIFF SR.

x _____
BOBBY J. RATCLIFF JR.

**Gulf Coast Bank & Trust Company**
**1110 Hwy 190, 2ⁿᵈ Floor**
**Covington, LA 70433**

Ref:    Authorized Signatures for Assignment of Accounts Receivables

To Whom It May Concern:

This is to advise you that the persons whose signatures appear below are hereby authorized to execute upon behalf of the undersigned firm assignments of accounts receivable pursuant to the terms of our RPA Agreement with you dated May ___ , 2017 and you are hereby authorized to accept the said signatures of such persons until such authorization is revoked in writing.

Very truly yours,

**DOUBLE EAGLE ENERGY SERVICES, L.L.C.**

Bobby Joe Ratcliff Sr.

TITLE:  Member/Manager

DATE: 8/10/2017

Kathy Tanner
TYPED OR PRINTED NAME

SIGNATURE

Bobby Joe Ratcliff, Sr
TYPED OR PRINTED NAME

SIGNATURE

Sharon Holley
TYPED OR PRINTED NAME

SIGNATURE

Bobby Joe Ratcliff Jr.
TYPED OR PRINTED NAME

SIGNATURE

_____
TYPED OR PRINTED NAME

SIGNATURE

# Payment Instructions

Double Eagle Energy Services, L.L.C. instructs and authorizes Gulf Coast Bank & Trust Company to make all payments to Double Eagle Energy Services, L.L.C. payment to bank and account specified below.

☐   Other: _____

**Wire Transfer information:**

Bank name: _Regions Bank_

Bank address: _2569 Viking Drive_
_____ _Bossier City, La 71111_      Regions Wire Transfer Number:

Bank ABA routing #: _____

Bank phone number: ( _318_ ) _742-2901_

Account name: _Double Eagle Energy Services_

Account #: ___ ___ _____

**THIS INSTRUCTION SUPERSEDES ANY PRIOR INSTRUCTIONS.  DOUBLE EAGLE ENERGY SERVICES, L.L.C. FURTHER ACKNOWLEDGES THAT THIS IS NOT A PAYROLL ACCOUNT.**

Client Name: _Double Eagle Energy Services, LLC_
            Printed or typed name

Printed Name: _Kathy Tanner_

Signature: _Kathy Tanner_

Title: _Controller_

Date: _August 11_ , 20 _17_

*(Please contact the receiving financial institution for accurate wiring instructions and provide a voided check.  Strict adherence to these instructions will help to ensure your transfers are not delayed)*

## INDIVIDUAL ACKNOWLEDGMENT

UNITED STATES OF AMERICA
STATE OF _Louisiana_
COUNTY / PARISH OF _Bossier_

On this _11_ day of August, 2017, before me, a Notary Public duly qualified in and for the state and parish/county aforesaid,

personally appeared Bobby Joe Ratcliff Sr., to me known, who being by me duly sworn, deposes and says that he/she resides at

_Bobby Joe Ratliff Sr_ _____ that he/she signed the foregoing document as his/her

free act of deed, intending to be bound thereby.

IN TESTIMONY WHEREOF, I have hereunto set my hand in the State of _Louisiana_, County / Parish of

_Bossier_ _____, on the _11_ day of August, 2017.

_Keith O. Cockerham_
Notary Public
Print name: _Keith O. Cockerham_
My commission expires: _for life_

## INDIVIDUAL ACKNOWLEDGMENT

UNITED STATES OF AMERICA
STATE OF _Louisiana_
COUNTY / PARISH OF _Bossier_

On this _11_ day of August, 2017, before me, a Notary Public duly qualified in and for the state and parish/county aforesaid,

personally appeared Bobby J. Ratcliff Jr., to me known, who being by me duly sworn, deposes and says that he/she resides at

_Bobby Joe Ratliff Jr_ _____ that he/she signed the foregoing document as his/her

free act of deed, intending to be bound thereby.

IN TESTIMONY WHEREOF, I have hereunto set my hand in the State of _Louisiana_, County / Parish of

_Bossier_ _____, on the _11_ day of August, 2017.

_Keith O. Cockerham_
Notary Public
Print name: _Keith O. Cockerham_
My commission expires:



EXHIBIT

17-80717

Db.2.

## FIRST AMENDMENT TO RECEIVABLES PURCHASE AGREEMENT

THIS FIRST AMENDMENT TO RECEIVABLES PURCHASE AGREEMENT (this "First Amendment"), made and executed this _____ day of August, 2017 (the "First Amendment Effective Date"), by and between **DOUBLE EAGLE ENERGY SERVICES, L.L.C.** (the "Company"); and **GULF COAST BANK AND TRUST COMPANY** ("GCBC").

Recitals.

a.  Company and GCBC are parties to that certain Receivables Purchase Agreement dated August 11, 2017 (as the same may have been amended or replaced from time to time, the "Original Agreement"; the Original Agreement, as amended by this First Amendment, the "Agreement"). Terms not otherwise defined herein shall have the meaning assigned in the Original Agreement.

b.  Company and GCBC wish to amend the Original Agreement as follows.

NOW THEREFORE, Company and GCBC agree as follows:

1.  The definition of "Maximum Amount" is hereby amended and restated to read as follows:

    "Maximum Amount" – $500,000.00, less any amounts owing under Related Party Documents.

2.  Company hereby ratifies, confirms and acknowledges all security interests, pledges, assignments and other rights granted under the Original Agreement and/or in connection with the Obligations, and agrees that such interests remain perfected and in full force and effect, with retroactive priority to the date of their first perfection.

3.  Except as modified hereby, the Original Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this First Amendment as of the date set forth above.

GCBC:
GULF COAST BANK AND TRUST COMPANY

By: _____
Title:



FILED

AUG 23 2017

EDWARD A. TAKARA, CLERK
UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF LOUISIANA

COMPANY:
DOUBLE EAGLE ENERGY SERVICES, L.L.C.

By: _____  Bobby Joe Ratcliff Sr.
Title:  Manager

**AND NOW INTO THIS FIRST AMENDMENT COME AND INTERVENE** Bobby Joe Ratcliff Sr. and Bobby Joe Ratcliff Jr. (each, a "Guarantor"), each of whom acknowledges that the guaranty executed by him in favor of GCBC continues in full force and effect, and is a guaranty of payment of all present and future RPA Warranty Obligations (as such term is defined in the guaranty) of Company to GCBC, and that each Guarantor has granted his consent to the execution of this First Amendment and all instruments and documents related thereto.


_____
BOBBY JOE RATCLIFF SR., Individually


_____
BOBBY JOE RATCLIFF JR., Individually


## ACKNOWLEDGMENT

UNITED STATES OF AMERICA
STATE OF _____
COUNTY OF _____

On this _____ day of August, 2017, before me, a Notary Public duly qualified in and for the county and state aforesaid, personally appeared Bobby Joe Ratcliff Sr., to me known, who being by me duly sworn, deposes and says that he resides at _____
_____, that he signed the foregoing document (i) as his free act and deed, intending to be bound thereby, and (ii) as the free act and deed of Double Eagle Energy Services, L.L.C. (the "Company"), in his capacity as Manager of the Company pursuant to the authorization of the Company's members and managers, intending to be bound thereby.

IN TESTIMONY WHEREOF, I have hereunto set my hand in the State of _____,
County of _____, on the _____ day of August, 2017.


_____
NOTARY PUBLIC
MY COMMISSION EXPIRES:


## ACKNOWLEDGMENT

UNITED STATES OF AMERICA
STATE OF _____
COUNTY OF _____

On this _____ day of August, 2017, before me, a Notary Public duly qualified in and for the county and state aforesaid, personally appeared Bobby Joe Ratcliff Jr., to me known, who being by me duly sworn, deposes and says that he resides at _____
_____, that he signed the foregoing document (i) as his free act and deed, intending to be bound thereby, and (ii) as the free act and deed of Double Eagle Energy Services, L.L.C. (the "Company"), in his capacity as Manager of the Company pursuant to the authorization of the Company's members and managers, intending to be bound thereby.

IN TESTIMONY WHEREOF, I have hereunto set my hand in the State of _____,
County of _____, on the _____ day of August, 2017.


_____
NOTARY PUBLIC
MY COMMISSION EXPIRES: